Karin M. Gunter, Esquire
PA Id No. 79852
Law Office of Karin M. Gunter
85 Old Cedarbrook Road
Wyncote, PA 1905
(215) 548-9992

ATTORNEY FOR PLAINTIFF
NATHANIEL SHRIEVES, JR.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NATHANIEL SHRIEVES JR.,
   Plaintiff,

v.

PHILADELPHIA GAS WORKS,
   Defendant.

Civil Action No.

JURY TRIAL DEMANDED

## COMPLAINT

### Preliminary Statement

Plaintiff files this complaint pursuant to §301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. §185 *et seq.* for violations of the collective bargaining agreement between Defendant Philadelphia Gas Works ("PGW" or "Employer") and the Gas Works Employees' Union of Philadelphia, Local 686 ("Union"); termination without cause, and unenforceable contract, *inter alia*.

Plaintiff seeks money damages; attorney's fees, costs, expenses, and other relief as this Court deems just and proper.

### Jurisdiction and Venue

1. Original jurisdiction over Plaintiff's federal question claims is conferred upon this Court pursuant to 28 U.S.C. §1331 and 29 U.S.C. §185 *et seq.*

2. Venue lies in this district by 28 U.S.C. § 1391(b) and (c) in that all actions complained of occurred and Defendants reside in this district. Supplemental jurisdiction over Plaintiff's state law claim is conferred upon this Court pursuant to 28 U.S.C. § 1367(a)

## Parties

3. Plaintiff NATHANIEL SHRIEVES, JR ("Shrieves") is an adult person and a citizen of the United States, who resides in Philadelphia, Pennsylvania.

4. PGW hired Shrieves on or about November 23, 2009 as a Helper in the Field Service Department.

5. PGW terminated Plaintiff's employment effective July 17, 2019 as a Serviceperson "A" in the Field Service Department.

6. At all times relevant to this action, Shrieves was a dues paying member of the Union.

7. Defendant PHILADELPHIA GAS WORKS is a municipality owned gas utility company. It is headquartered at 800 W. Montgomery Avenue, Philadelphia, PA 19122 ("PGW Headquarters") with more than 500 employees.

## Factual Allegations

8. Plaintiff re-avers and incorporates by reference all averments in all paragraphs, *supra*.

9. Plaintiff worked in the Field Service Department for his entire career at Defendant PGW, working his way up from a helper to a service technician, i.e., serviceperson.

10. Service technician rankings go from D (lowest) to A (highest).

11. Plaintiff continued his employment in the Field Service department moving from a helper (lowest level) to service technician "B," when on May 26, 2016, he was charged with violation of Company Workplace Violence/Threat Policy.

12. On May 26, 2016, Plaintiff was given a job to determine why a specific meter did not have any recent gas usage. At that time, Plaintiff was assigned to the Meter Investigation unit in the Field Service department.

13. The location of the meter investigation assignment was at the Women against Abuse organization at 6033 Germantown Avenue, Philadelphia, PA.

14. When Plaintiff arrived, he asked to see a supervisor or maintenance personnel to determine where the gas meters were stored.

15. The maintenance personnel and Plaintiff found the meter, and Plaintiff shut off the meter.

16. As Plaintiff was leaving the facility, he encountered the supervisor who helped him when he initially arrived at the location.

17. The supervisor asked him if he found the meter and if everything was ok. He answered in the affirmative.

18. Plaintiff then asked a general question about how a woman would be eligible to be helped by the organization.

19. As Plaintiff, the maintenance personnel and supervisor started to discuss the question, the supervisor invited Plaintiff to complete the discussion in her office.

20. As the discussions continued, the supervisor explained that their services were opened to anyone. The supervisor gave Plaintiff the phone number to her supervisor, if he needed additional information.

21. At that point, Plaintiff left the facility.

22. A week later, PGW personnel (Manpower) called Plaintiff to PGW headquarters and asked him what happened at the May 26, 2016 Women against Abuse meter investigation. Plaintiff appeared at PGW headquarters with his union representative Mike Hudson and Ray Wolf.

23. Plaintiff explained what happened on May 26, 2016 at Women against Abuse. PGW suspended Plaintiff until they were "finished with their investigation."

24. On or about June 16, 2016, PGW determined Plaintiff violated company workplace violence/threats policy for allegedly "enter[ing] the office of a case manager employed by the organization, clos[ing] the door and bec[oming] aggressive and threatening while trying to obtain information about the mother of his children, a possible resident in the Women against Abuse shelter," *inter alia*. (Ex. A, *infra*) PGW then terminated Plaintiff. At that time he was a Serviceperson "B".

25. Plaintiff denied all the allegations, since at the time of this incident, he and his children's mother had shared legal and physical custody of the children, and Plaintiff picked up and dropped off the minor children at their mother's home, *inter alia*. Thus, his children's mother was not a resident of the Women against Abuse shelter.

26. Furthermore, Plaintiff and his children's mother were in a custody battle with Shrieves seeking primary physical custody of the children.

27. Plaintiff never discussed his personal affairs (i.e., child custody lawsuit) with PGW management or Women against Abuse on before or on May 26, 2016.

28. Plaintiff never discussed his workplace disciplinary action with his children's mother or her attorney, but during the child custody hearing, counsel for his children's mother mentioned Plaintiff's work place discipline and termination, *inter alia*.

29. During PGW's investigation process, neither Plaintiff nor his union representatives were given any information regarding or copies of the Women against Abuse personnel's statements or other alleged statements against him.

30. Plaintiff filed for unemployment compensation upon termination, and appealed the unemployment compensation service center denial of his benefits.

31. Before the unemployment compensation referee's decision on his appeal, Plaintiff received notification that the PGW and the Union agreed to bring him back based on a

memorandum of agreement, i.e., last chance agreement.

A true and correct copy of the resultant Last Chance Agreement (Memorandum of Agreement)("LCA") is attached hereto as Exhibit "A".

32. Under LCA, Plaintiff's termination was commuted to a 31 day suspension; participation in and completion of anger management counseling classes were required; and re-assignment from Belfield to Porter station was made, *inter alia.*

33. Other terms of LCA include:

> "The Parties [PGW and the Union] agree that any future violation of the Workplace Violence/Threats Policy #003-19 or any major work rule violating the Company's Corporate Discipline Policy shall result in Mr. Shrieves immediate termination *without recourse of the grievance or arbitration procedure.*" (text and emphasis added)(Ex. A ¶ 2)

> Mr. Shrieves, for himself, his heirs, executors, administrators, agents, beneficiaries and assigns, does waive, release and forever discharge the Company and the Union of and from any and all claims Mr. Shrieves now has or may have or claim to have in the future against the Company and the Union regarding *this termination*. Mr. Shrieves hereby covenants not to file a lawsuit or claim asserting such claims. Mr. Shrieves agrees that he will not permit any other party to seek monetary damages on his behalf, or to assert any such claim, nor accept monetary relief if such as action is filed. *This release does not, however, cover claims relating to the validity or enforcement of this Last Chance Memorandum of Agreement.*" (emphasis added)(Ex. A ¶ 8)

34. The language of LCA is ambiguous as to whether it prohibits Plaintiff from grieving and arbitrating PGW's determination that a violation of its terms occurred, or prohibits Plaintiff from grieving and arbitrating termination of his employment after PGW determined a violation occurred.

35. The parties and Plaintiff executed LCA on July 11, 2016.

36. Plaintiff resumed his employment with defendant PGW without further disciplinary incident until June 28, 2019. In fact, during that time, he was promoted to Field Service department Serviceperson "A".

37. On June 28, 2019, Plaintiff began his workday as normal. He reported to work at

the Porter station at approximately 7:22 a.m., checked into his company vehicle, and logged into the onboard Advanced Intelligence Management System ("AIMS") to review morning and afternoon job assignment locations and tasks, *inter alia.*

38. After finishing a job assignment on the 200 block of South Felton Street ("Felton"), Plaintiff proceeded towards his next assignment on the 5900 block of Media Street ("Media").

39. Plaintiff attempted to call the Media customer, but due to problems with PGW phone service, the call kept searching for a signal and would not go through. Plaintiff decided to proceed to the Media location, which was approximately 5 minutes away from the Felton location.

40. Upon arrival at 60th and Media Streets, a group of men approached Plaintiff's company vehicle complaining of a gas smell.

41. Plaintiff rolled down the vehicle window and smelled gasoline and not natural gas. Plaintiff then exited the vehicle to talk to the group to assure them it was not a natural gas leak.

42. Plaintiff proceeded to the Media customer's home and knocked on the front door.

43. Getting no response, Plaintiff returned to his company vehicle, parked it in front of the customer's home and again attempted to contact the Media customer. This time the call went through, and Plaintiff spoke to the Media customer, who needed additional time (20 – 30 minutes) to get to the residence. Since Plaintiff could not wait that amount of time, he could not perform the services and CGI'd ("Can't Get In") the assignment.

44. After the Media assignment, Plaintiff took his p.m. break. During this break, Eric Lopez ("Lopez"), Field Service supervisor called Plaintiff to find out what happened at the Media job. Lopez explained to Plaintiff that the Media customer complained to PGW about Shrieves, and that Lopez wanted to get Plaintiff's side of the story. Plaintiff explained what happened and that he left a 490, i.e., paperwork left inside the customer's door explaining that

PGW tried to make the appointment, but it was missed because the customer was not home. Lopez asked Plaintiff to send him a text message of customer's phone number, which Plaintiff did.

45. Later that day, PGW via PGW Manager of Labor Relations for Fields Services Administration, Jose Delgado ("Delgado") called Plaintiff telling Shrieves not to return to the house on Media Street and on Monday morning to report at 7:00 a.m. to PGW headquarters.

46. On Monday, July 1, 2019 when Plaintiff arrived at PGW headquarters, he was told to sit at a cubicle. Plaintiff asked union representative Mike McDonough if McDonough had any information as to what the Company's position was regarding the June 28, 2019 incident. McDonough had no answers.

47. Plaintiff continued to go to PGW headquarters until July 16, 2019, when there was a "disciplinary hearing" for the "purpose of . . . discuss[ing] the June 28, 2019 customer complaint that ***you engaged in inappropriate and unprofessional conduct by refusing PGW's directive that you activate the customer's gas service.***" (emphasis added)(Exhibit "B", July 23, 2019 Termination Letter, Robert Smith ("Smith"), Director, PGW Employee Relations, Development and Support Services)

48. In attendance at the July 16, 2019 hearing were: Plaintiff; union representatives Michael Hudson and David Baback; PGW Senior Vice President of Labor Relations, Charles Grant ("Grant"); PGW Manager of Labor Relations, Michael Groves; Delago and Smith.

49. Grant conducted the hearing, reviewed the Field Service department call ahead procedure and told Plaintiff he was terminated since "failure to call ahead was a major work rule violation." (*Cf.* Ex. B)

50. Grant did NOT read a hand written complaint from the Media customer articulating her telephone complaint against Plaintiff at the July 16, 2019 hearing. (*Cf.* Ex. B)

51. Grant did say at the July 16, 2019 hearing that failure to call ahead constituted improper and/or unprofessional treatment of a customer and that failure to call ahead was a major work rule violation under the Company's Corporate Discipline Policy.

52. Thus, having determined that Plaintiff ***violated the Field Service Department's call ahead procedure, a major work rule constituting improper and/or unprofessional treatment of a customer under the Company's Corporate Discipline Policy***, PGW via Grant terminated Plaintiff's employment effective July 17, 2019 in accordance with LCA. (emphasis added)(*See* Ex. B)

53. Plaintiff filed for unemployment compensation benefits ("UC Benefits") July 21, 2019.

54. On July 23, 2019, Smith composed the termination letter and sent it to Plaintiff.

55. PGW challenged Plaintiff's UC benefits application based on Plaintiff's alleged unsatisfactory work performance "violation of the company workplace violence/threat policy and improper and/or unprofessional treatment of a customer" as well as an alleged misconduct of "falsely recorded events of the assignment" resultant from the Media customer complaint and Plaintiff's LCA.

A true and correct copy of PGW's July 30, 2019 Employer Questionnaire is attached hereto as Exhibit "C".

56. On August 8, 2019, the Altoona Unemployment Compensation Service Center ("Altoona UCSC") interviewed Plaintiff via telephone regarding the June 28, 2019 incident, emphasizing Plaintiff's alleged failure to call the Media customer while enroute based on "special instructions" Plaintiff allegedly received and violation of PGW's workplace violence/threat policy and improper and/or unprofessional treatment of customer. (*See also* Ex. B)

A true and correct copy of the internal notes from the August 8, 2019 telephone interview by the Altoona UCSC is attached hereto as Exhibit "D".

57. During the Altoona UCSC telephone interview, Plaintiff complained of problems with the PGW issued phones including them not working and "searching for service." (Ex. D)

58. Thereafter, Plaintiff received a Notice of Determination dated August 9, 2019 informing him of the denial of UC benefits based on willful misconduct.

A true and correct copy of the August 9, 2019 Notice of Determination is attached hereto as Exhibit "E".

59. Plaintiff appealed the Notice of Determination on August 17, 2019, and a referee hearing took place on September 13, 2019.

60. PGW appeared at the UC referee hearing represented by Delgado and PGW Senior Attorney Brett Zahorchak ("Zahorchak"). Plaintiff and his undersigned counsel also appeared.

A true and correct copy of the September 13, 2019 Referee Hearing transcript is attached hereto as Exhibit "F".

61. Prior to the September 13, 2019, Plaintiff via counsel requested and received subpoena *duces tecum* directing PGW to produce certain documents. Included in the subpoena were requests for copies of PGW's Corporate Discipline Policy, Company Workplace Violence Policy, Threats Policy and Improper and/or Unprofessional Treatment of a Customer Policy, *inter alia*.

A true and correct copy of the September 9, 2019 Subpoena *Duces Tecum* issued by the referee in accordance with Plaintiff's request is attached hereto as Exhibit "G".

62. At the hearing on September 13, 2019, Zahorchak made an oral motion to quash portions of the September 9, 2019 subpoena *duces tecum*, namely items 2 (company workplace violence policy), 3 (company threat policy), 8 (transcript and/or company records of Media

customer statement call into PGW on June 28, 2019) and 9 (copy of handwritten complaint from customer of record 'articulating her phone encounter" with claimant alleged to have been read by Charles Grant, Senior Vice President of Labor Relations to claimant on July 16, 2019) as having no probative value. (Ex. F at 5-6) The Referee sustained the oral motion.

63. PGW specifically limited the reason for Plaintiff's termination to "violation of the corporate discipline policy for improper and unprofessional treatment of a customer" with the "sole issue before the Referee is whether [Plaintiff] followed the call ahead [Field Service Department] procedure." (Ex. F at 5, 34)

64. PGW presented its Field Service Department Call Ahead procedure as employer exhibits 10 and 11.

True and correct copies of the Field Service Department Call Ahead procedures presented at the September 13, 2019 referee hearing are attached hereto as Exhibit "H" as ER10 and ER11.

65. When cross-examined by counsel for Plaintiff, PGW witness and PGW Manager of Labor Relations for Fields Services Administration, Delgado testified that PGW tested Plaintiff "on call ahead procedure on 'day one'" but not every single day. (Ex. F at 25)

66. Delgado further testified that neither of the Field Service Department call ahead procedures as presented in employer's exhibit 10 nor exhibit 11 say the "failure to call ahead based on [the Field Service Department call ahead procedures] would be considered improper and unprofessional conduct". (Ex. F at 30)

67. Delgado also testified that neither exhibit ER10 nor ER11 state that failure to follow either procedure will result in discipline. (*Id.* at 31)

68. Delgado finally testified that PGW's Corporate Discipline Policy as presented as Employer 2 does not state that failure to comply with the field service call ahead procedures

would be considered a work rule violation and/or an improper and unprofessional treatment of a customer. (*Id.*)

A true and correct copy of PGW's Corporate Discipline Policy as presented on September 13, 2019 as Employer 2 (ER2) is attached hereto as Exhibit "I".

69. Plaintiff testified he did in fact attempt to call the Media customer ahead of arriving at the property but had problems with the PGW issued phone. (Ex. F at 33, 35-36)

## COUNT I
### Breach of Collective Bargaining Agreement
### §301 of Labor Management Relations Act

70. Plaintiff re-avers and incorporates by reference all averments in all paragraphs, *supra*.

71. Plaintiff as a dues paying member of the Union was protected by the collective bargaining agreement between PGW and the Union ("CBA").

A true and correct copy of the current CBA, effective May 15, 2015 is attached hereto as Exhibit "J".

72. Under the CBA, PGW has the right to terminated employees "for cause." (Ex. J, Art. III, §3)

73. Under the CBA, a discharged employee has the right to grieve and arbitrate his/her termination pursuant to Step Two of the grievance protocol. (Ex. J, Art. XI, §§5, 8 and Art. XII)

74. The CBA does not provide that the grievance and arbitration procedure are the exclusive remedy for contract validity and/or enforcement matters.

75. The last chance agreement/contract executed by Plaintiff, PGW and the Union (LCA) prevents the grievance and arbitration procedures of the CBA from being invoked for "any future violation of the Workplace Violence/Threats Policy [ ] or any major work rule violating the Company's Corporate Discipline Policy." (Ex. A, ¶2)

76. Thus, Plaintiff is not permitted to exhaust the CBA remedies and/or abide by any finality provisions before bringing this action.

77. PGW gives several inconsistent and changing reasons for its termination of Plaintiff from employment effective July 17, 2019 including, but not limited to, failure to follow a PGW directive to activate a customer's gas service; violation of PGW's workplace violence/threat policy; failure or refusal to call a customer enroute to the job assignment based on special instructions; and violation of its Field Service Department call ahead procedures.

78. After alleging Plaintiff's (a) unsatisfactory work performance on several company policies; (b) failure to call customer based on special instructions; (c) failure to follow a PGW directive to activate a customer gas service; and (d) misconduct based on allegedly falsely recording events of an assignment, PGW finally committed to one narrative as the basis for Plaintiff's termination – violation of PGW's Field Service Department Call Ahead procedures deemed to be a major work rule violation constituting improper and/or unprofessional treatment of a customer, a Corporate Discipline Policy.

79. However, PGW never gave Plaintiff notice in its Field Service Department call ahead procedures (or in its Corporate Discipline Policy) that failure to call ahead consistent with the Field Service procedures is a disciplinary action, is a violation of a corporate discipline policy, is a major work rule violation and/or is a terminable offense.

80. In fact, other than Plaintiff's first day of employment ("day one"), PGW did not consistently test, train or discuss the Field Service Department call ahead procedure. (Ex. F at 25, 30-31).

81. Based on the above discussions, PGW terminated Plaintiff's employment without cause since Plaintiff attempted to contact the Media customer but a faulty PGW-issued phone could not complete the call, the "special instructions" could only be viewed on the AIMS system

once he arrived at the job assignment, and PGW failed to provide Plaintiff with any prior notice the failure to follow the Field Service Department call ahead procedures is a disciplinary action, is a major work rule violation, is a violation of a corporate disciplinary policy and/or is a terminable offense, *inter alia*.

**WHEREFORE**, Plaintiffs respectfully request this Honorable Court enter judgment in his favor and against Defendant PGW in the form of money damages, reinstatement, attorney's fees, expert fees, costs and such other relief as this Court deems proper and just.

## COUNT II
### Unenforceable Contract (July 11, 2016 Last Chance Agreement) – Public Policy and Undue Influence

82. Plaintiff re-avers and incorporates by reference all averments in all paragraphs, *supra*.

83. When Plaintiff entered LCA, he was in child custody litigation.

84. Plaintiff did not discuss his child custody lawsuit with PGW or his children's mother and/or her lawyer.

85. Plaintiff's child's mother lived in a house and they shared physical custody of their two children, which included Plaintiff picking up and dropping off his children at their mother's home during his custodial time.

86. Plaintiff's children's mother was not a resident of Women against Abuse shelter on or about May 26, 2016 or thereafter.

87. PGW's conclusion that "the mother of his children, a *possible* resident in a Women against Abuse shelter" is unreasonable, without foundation or merit. (emphasis added)(Ex. A)

88. PGW used this baseless allegation and unsubstantiated hearsay statements by unnamed personnel at the Women against Abuse organization against Plaintiff to unduly influence Plaintiff to acquiesce to entering into LCA.

89. Further, PGW's conduct of using an employee's personal affairs and hearsay statements along with its failure to allow Plaintiff to have a copy of the allegations or confront the alleged case manager making the hearsay statements are against public policy of procedural due process.

90. Finally, PGW, a municipality-owned gas company, exercised undue influence over Plaintiff in the formation of the LCA, since Plaintiff was in the middle of a custody lawsuit seeking primary physical custody of his two minor children and needed his employment and employee benefits to provide for himself, his children's care and his legal bills, *inter alia*.

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court enter judgment in his favor and against Defendant in the form of rescission of the July 11, 2016 last chance agreement (LCA); money damages, reinstatement, attorney's fees, expert fees, costs and such other relief as this Court deems proper and just.

**Respectfully submitted:**

**LAW OFFICE OF KARIN M. GUNTER**

/s/ Karin M. Gunter
Karin M. Gunter, Esquire